**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SANTOS S., ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 25 C 2128 |
| v. ) | |
| ) | Judge Sara L. Ellis |
| FRANK BISIGNANO, Commissioner of ) | |
| Social Security, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Plaintiff Santos S. seeks to overturn the final decision of the Commissioner of Social

Security (the "Commissioner") denying his application for disability insurance benefits ("DIB")

under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423 and for supplemental security

income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381(a). In addition to

Santos S.' appeal of the decision denying his application for benefits, the Commissioner has filed

a motion for summary judgment, asking the court to uphold the decision. Because Santos S. has

not identified any reversible error, the Court affirms the denial of benefits.

**BACKGROUND**

**I. Procedural History**

On October 12, 2021, Santos S. filed an application for DIB and SSI, indicating an

alleged onset date of January 1, 2018 based on blindness or low vision, impaired eyes, migraine

headaches, and weakness. AR 86, 117. On March 30, 2022, the Social Security Administration

("SSA") denied his application. AR 86–101. Santos S. requested reconsideration, AR 158–159,

and the SSA denied that request on January 17, 2023, AR 102–113. Santos S. then requested a

hearing before an administrative law judge ("ALJ"). AR 117, 177.

On February 1, 2024, the ALJ held a hearing, at which Santos S. and the vocational expert testified. The ALJ issued a written opinion on March 12, 2024, finding that Santos S. did not qualify as disabled. AR 114–142. Santos S. requested that the Appeals Council review the ALJ's opinion, and the Appeals Council denied Santos S.' request for review on December 31, 2024. AR 1–4. Santos S. then filed this action for judicial review of the SSA's denial on February 28, 2025.

## II. Factual Background

Santos S. was born in 1968. AR 277. In a work history report, he indicated that he served time in jail from 1994 to 2001, and that after this, he worked as a tow truck driver, automobile labor mechanic, and as security at a truck yard. AR 314. In a function report he completed on January 17, 2022, he indicated he was homeless and could not see well, with the remainder of his answers colored by these circumstances. AR 332–339. He noted he did not need help or reminders to take his medicine. AR 334. He stated that he could follow written instructions "ok for now" but was "not to[o] good" with following spoken instructions. AR 337.

### A. Medical Evidence

On January 4, 2018, Santos S. presented to the Rush emergency room complaining of a cough, and emergency room staff diagnosed him with pneumonia. AR 722. An electrocardiogram noted a right bundle branch block and a left anterior fascicular block. AR 725. His medical chart indicates he had a "normal mood and affect," with normal behavior, judgment, and thought content. AR 731. On January 23, 2018, Santos S. returned to the Rush emergency room complaining of abdominal pain and diarrhea. AR 701, 709. He followed up with a visit to Friend Family Health Center on January 24, 2018, complaining of diarrhea. AR

2

1100.  At the time, Santos S. weighed 215 pounds and was 5'2", with a body-mass index of 39.54, rendering him obese.  AR 1099.

On March 29, 2018, Santos S. visited the Rush emergency room complaining of a cough and abdominal pain, with testing showing he had influenza B.  AR 668, 671, 683.  An electrocardiogram again showed the right bundle branch block but indicated that the left anterior fascicular block was no longer present.  AR 673.  On April 26, 2018, Santos S. presented to the Rush emergency room, with doctors diagnosing him with a right ureteral stone.  AR 647.  He received IV medications at the hospital.  AR 656.  On June 19, 2018, Santos S. returned to the Rush emergency room complaining of chest pain and a cough.  AR 606.  He indicated the pain felt like "a bubble in [his] chest," lasted for about twenty to thirty minutes, and stopped when he hit himself in the chest.  AR 620.  An electrocardiogram again showed a right bundle branch block.  AR 623.  Santos S. received fluids and was discharged.  AR 623.

On March 14, 2019, Santos S. went to Friend Family Health Center complaining of headaches and chest pain.  AR 1108.  In the depression screening, he had a PHQ-2 score of 5, stating he had little interest or pleasure in doing things nearly every day over the last two weeks and felt down, depressed, or hopeless for more than half of those days.  AR 1106.  His PHQ-9 score was 20, suggesting major depression.  AR 1107–1108.  He also registered a generalized anxiety disorder 7 (GAD-7) score of 18, which suggested severe anxiety.  AR 1106–1107.  Because his electrocardiogram was abnormal, the doctor told Santos S. to go to the emergency room for evaluation.  AR 1110.  Later that day, Santos S. presented to the Rush emergency room with chest pain, complaining that it felt like there was "a little ball that goes across his chest."  AR 524.  An electrocardiogram continued to show a right bundle branch block.  AR 527.  Santos S. remained in the hospital until March 16, where he underwent a stress test.  AR 522, 540.  The

3

stress test showed a small area of mild ischemia in the LAD distribution, making it a borderline abnormal study, AR 570, but a cardiologist thought it may be a false positive finding and so suggested further imaging as an outpatient, AR 574–575. Santos S.' medical chart from this visit reflects that he felt suicidal ideation in 2016 but denied any such suicidal ideation at the time. AR 541, 547. When speaking to a social worker, he reported he was independent with activities of daily living. AR 547. On March 22, 2019, the Rush primary care internal medicine team saw Santos S. to follow up on his hospital admission for chest pain. AR 511–512. He reported he had not had any additional episodes of chest pain since discharge and that when he did have chest pain, it got better when he "punche[d] his chest." AR 512.

During a July 9, 2019 office visit at Friend Family Health Center, Santos S. had a GAD-7 score of 19, suggesting severe anxiety, and a PHQ-9 score of 13, suggesting moderate major depression. AR 1114–1115. The doctor referred Santos S. to a behavioral health consultant for an initial evaluation, AR 1116, but nothing in the record suggests that he followed through with this referral. On August 24, 2019, Santos S. reported to the UI Hospital emergency room with a dog bite on his right hand, complaining of some tingling in his right index finger. AR 745. On December 12, 2019, when Santos S. visited Friend Family Health Center complaining of blood in his stool and headaches, he had a PHQ-2 score of 0, indicating no depression. AR 1124. During a December 24, 2019 appointment, Santos S. complained of a cough and a left breast and right buttock mass that had bothered him for over two years. AR 1130–1131. At this time, Santos S. weighed 222 pounds, making him morbidly obese. AR 1129.

On November 8, 2020, Santos S. reported to the Rush emergency room complaining of a cough, headache, fatigue, and abdominal pain. AR 499. He tested positive for Covid-19 and received IV fluids. AR 503, 508. On November 18, 2020, he returned to the Rush emergency

room, complaining of a continuing cough and shortness of breath. AR 489. Although he claimed his Covid-19 symptoms had improved, he sought reevaluation. AR 494. The doctor discharged him with Covid-19 precautions. AR 496.

On February 2, 2021, Santos S. visited the UI Hospital general eye clinic. AR 769. He reported that he occasionally worked at Jewel and other small jobs. AR 771. According to Santos S., nine days before, while working on his car, the windshield broke, with glass particles entering his eyes. AR 769. He indicated that several days later he could not open his eye, so he rinsed it out with tap water and tried removing the glass particles with a clean needle. AR 769. He reported having some light sensitivity, slightly blurry vision, foreign body sensation, and a headache. AR 769. The doctor removed the glass from his right eye. AR 773. Prior to this accident, he wore glasses for driving. AR 770. At the time, using the Snellen test, uncorrected, he had 20/60 vision in his right eye and 20/50 vision in his left eye. AR 772. Two days later, Santos S. reported that he continued to feel small particles of debris in his eyes, but he had stable vision and no eye pain. AR 778.

On March 28, 2021, Santos S. visited the Rush emergency room, complaining of shortness of breath, blood in his stool, a loss of taste, and a swollen abdomen. AR 419, 422, 426, 427. Blood test results revealed elevated blood glucose levels, which suggested new onset diabetes, and prompted the doctors to provide him with insulin and prescribe Metformin. AR 429. An electrocardiogram again noted a right bundle branch block. AR 473. During this visit, Santos S. reported that he had had thoughts of suicide over the past month, including an intention of acting on them, but he also denied a history of depression and other psychiatric disorders. AR 423, 428. He indicated that he had recently put an unloaded gun to his head because he could not sleep given noise around him, but he denied any intent to pull the trigger or otherwise cause

self-harm. AR 449, 464. A psychiatric evaluation concluded that he did not require admission, could be discharged with outpatient resources, and was "future oriented, goal-directed." AR 429, 464. It also noted that Santos S. had never seen a psychiatrist or therapist in the past. AR 464. On April 29, 2021, at an appointment at Friend Family Health Center, Santos S. had a PHQ-2 depression screening score of 0 and a GAD-2 anxiety screening score of 0, and he denied having depression or anxiety. AR 1138, 1140.

On October 1, 2021, Santos S. returned to the UI Hospital general eye clinic, reporting that he had hit himself in the left eye with a wrench and had since seen floaters but otherwise had stable vision. AR 783–84. His eye exam indicated he had uncorrected 20/40 vision in both eyes, which improved to 20/30 with pinhole correction to the right but did not improve on the left. AR 784. His left eye showed retinal detachment temporally with multiple tears, AR 786, prompting him to have surgery the following day to repair the retinal detachment, AR 806–807. During a follow up visit on October 4, 2021, a visual exam showed that with the left eye, he could only count fingers at six feet, which improved to 20/400 vision with pinhole correction, while he had 20/40 uncorrected vision on the right, which improved to 20/30 with pinhole correction. AR 851. Santos S. developed some chorioretinal scars after the surgery on the left eye. AR 871. After his sutures were removed on October 28, 2021, his eye exam showed uncorrected 20/60 vision in the right eye, improved to 20/40 with pinhole correction, and uncorrected 20/200 vision in the left, which did not improve with pinhole correction. AR 861. Despite receiving a prescription for glasses, he had not yet obtained them as of a December 13, 2021 visit. AR 872. In January 2022, Santos S. complained of dry eyes, which the ophthalmologist thought was likely worse after the detachment. AR 879. During a March 16, 2022 visit to the UI Hospital dry eye and ocular disease clinic, Santos S. complained of light sensitivity, grittiness, blurred

6

vision, and discomfort. AR 1039. The ophthalmologist believed his symptoms were "consistent with at least some component of corneal neuropathic pain." AR 1045. Santos S. reported improvement at his next appointment on April 18, 2022. AR 1051. During an April 28, 2022 visit, he reported not wearing his glasses because he found them bothersome, with the ophthalmologist emphasizing the need to wear them. AR 1063. Testing showed he had 20/60 uncorrected vision on the right, which improved to 20/40 with pinhole correction, and 20/400 uncorrected vision on the left, which improved to 20/100 with pinhole correction. AR 1065. The ophthalmologist suspected a residual or recurrent retinal detachment but planned to observe the eye to determine whether it would resolve on its own. AR 1063.

On April 29, 2022, Santos S. visited Friend Family Health Center, where he again had a PHQ-2 depression screening score of 0 and a GAD-2 anxiety screening score of 0. AR 1146. He complained of lower abdominal pain and a hard mass in his right testicular region. AR 1147. He weighed 207 pounds at this visit. AR 1145. Friend Family Health Center referred him for surgery for an inguinal hernia. AR 1152. On May 6, 2022, Santos S. had imaging done that confirmed a unilateral inguinal hernia. AR 1070. On July 12, 2022, he presented to the UI Health gastroenterology center, complaining of rectal bleeding and abdominal pain. AR 1072. At that visit, Santos S. scheduled a colonoscopy for March 2023, AR 1075, although records suggest that it never occurred.

On September 20, 2022, Santos S. complained that his dry eyes had gotten gradually worse, with him having to "keep rubbing [his] eyes in order to see clearly." AR 1078. Vision testing showed 20/50 uncorrected vision on the right and 20/80 corrected vision on the left. AR 1082.

On December 22, 2022, Santos S. visited Friend Family Health Center, where he again had a PHQ-2 depression screening score of 0 and a GAD-2 anxiety screening score of 0. AR 1156. He reported having pain in his stomach and the notes from his visit reflect he had not been compliant with his treatment for diabetes, failing to take metformin for several months or check his sugar, and he complained of vision changes and peripheral neuropathy. AR 1157. He also had not followed up with surgery for his hernia. AR 1157.

On February 7, 2023, Santos S. visited the ophthalmology clinic, complaining that his left eye was worsening, that he has been losing his balance since September 2022, and that he could not afford methylprednisone. AR 1758. Vision testing revealed uncorrected 20/30 vision in his right eye and uncorrected 20/200 vision in his left eye, which improved to 20/80 with pinhole correction. AR 1762. The ophthalmologist told him to use glasses to improve his vision, but Santos S. indicated that he did not want to wear them because they caused him irritation. AR 1765. On February 20, 2023, Santos S. complained of peripheral neuropathy and noted that he was not taking glucose at home because of a machine malfunction. AR 1185. His A1c had improved but remained elevated. AR 1185. The notes of his visit indicate that he did not report any depression, anxiety, or agitation. AR 1185.

Santos S. returned to the eye clinic on March 9, 2023, where doctors again diagnosed him with left eye retinal detachment with multiple breaks. AR 1772. With glasses, vision testing showed he had 20/25 vision on the right and 20/70 on the left. AR 1776. He had surgery the following day to repair the detachment. AR 1813–1814. On April 8, 2023, Santos S. presented to the UI Hospital emergency room complaining of vision loss, indicating he felt like there was black liquid in his eye and he could not see anything out of his eye aside from light reflections. AR 1971, 1974. He went from the emergency department to the eye clinic, where doctors

confirmed a near total detachment. AR 1992. Santos S. returned to the eye clinic on April 10, 2023, with an examination revealing recurring inferior retinal detachment, and he made plans for surgery to repair the retinal detachment of his left eye. AR 1999, 2002. That same day, Santos S. also presented to the UI Hospital emergency room complaining of chest pain that had worsened over the prior three days. AR 2025. He indicated the pain felt sharp, like a "cinderblock," and often resolved in an hour, with hitting the chest with a closed fist helping. AR 2025. Santos S. reported that he had shortness of breath after walking three blocks, and he had experienced this issue for about two years. AR 2025. Doctors in the emergency room referred him for a cardiology assessment but he decided to leave the hospital before seeing a cardiology attending because of pressing issues he needed to address at home. AR 2053, 2057.

Santos S. had another surgery to repair the retinal detachment of his left eye on April 14, 2023. AR 2186–87. A follow up visit on April 21, 2023 revealed uncorrected 20/30 vision in the right eye and uncorrected 20/500 vision in the left eye. AR 2306. On May 4, 2023, Santos S. returned to the eye clinic complaining of blurred vision. AR 2321. On May 23, 2023, Santos S. presented to the Rush emergency room complaining of a headache, dizziness, and nausea after donating plasma on May 18. AR 1201. Because he had an oil in his eye due to severe retinal detachment that was causing elevated pressures, the Rush emergency room personnel consulted with his UI Hospital ophthalmology team and then had Santos S. transported from the emergency room to the ophthalmology clinic by ambulance on May 24. AR 1210, 1214. Santos S. reported that he had eye pain for approximately two days after dust flew into his left eye and after he had flushed it with eye wash, but he continued to have intense pressure pain in the eye, which also caused the left side of his face to feel numb and to make him nauseous. AR 2346. Santos S. returned to the UI ophthalmology clinic the following day, with elevated intraocular

9

pressure in his left eye, and clinic personnel instructed him to return the following day to see his retinal specialist. AR 2379. On May 25, 2023, Santos S. had urgent surgery to remove silicone oil from his left eye and reduce the risk of elevated intraocular pressure and glaucoma progression. AR 1249, 2395. Examinations and imaging in June 2023 indicated suspected proliferative vitreoretinopathy, retinal detachment, or vitreous remnants anterior to the scleral buckle. AR 2655. On June 22, 2023, he had 20/30 uncorrected vision in the right eye but could only see hand motions in the left eye. AR 2620.

On June 26, 2023, Santos S. visited Friend Family Health Center, complaining of unintentional weight loss and abdominal pain. AR 1305, 2725. At the time, he weighed 190 pounds, with a body-mass index of 34.88, which still classified him as obese. AR 2724. During a July 11, 2023 dry eye clinic visit, Santos S. complained that his right eye had difficulty focusing because of the issues with the left eye and that it felt like there was liquid inside his eyes. AR 2678. On August 28, 2023, Santos S. reported to the UI Hospital emergency room complaining of right elbow and lumbar back pain after he tripped and fell in the back of his truck. AR 2814. An x-ray did not show any dislocation or fracture, and so the emergency room discharged him after giving him ibuprofen for the pain. AR 2817. On November 20, 2023, Santos S. had an appointment with the UI Hospital ENT clinic, with a note that he could not hear out of his right ear, but he did not show up for his appointment. AR 2784. Santos S. presented to the Friend Family Health Center on December 27, 2023 complaining of abdominal pain, sore throat, and headaches. AR 2739. He tested positive for strep and began antibiotics. AR 2740. On January 10, 2024, Santos S. returned to the eye clinic, complaining of irritation and dry eyes, but he did not report any vision changes. AR 2774. He continued to have 20/30 vision on the right but only could count fingers on the left. AR 2775.

10

B.      **Medical Opinions**

Santos S. underwent an internal medicine consultative exam with Dr. Muhammad Rafiq on March 1, 2022.  AR 888, 891.  Dr. Rafiq's report focused on Santos S.' poor vision, noting that Santos S. stated "that his other medical problems are not severe enough to make him disable[d]."  AR 888.  Santos S. reported to Dr. Rafiq that he could not drive, could only see "big objects," could watch television only with his right eye, could only read his cell phone up close with a big font, and bumped into objects.  AR 888.  Santos S. reported being able to walk three blocks at a time, stand for forty minutes at a time, sit for ninety minutes at a time, climb up to two flights of stairs at a time, and cook, shop, bathe, and dress normally.  AR 889.  Dr. Rafiq observed that Santos S. could walk more than fifty feet without support and had normal range of motion.  AR 890–894.  Vision testing indicated uncorrected 20/70 vision in the right eye, which improved to 20/20 with pinhole correction, with Santos S. unable to see the chart in the left without correction but with pinhole correction, the left eye improved to 20/200.  AR 889.  Dr. Rafiq did not test Santos S.' visual field in the left eye, but his right eye was normal.  AR 889.  Dr. Rafiq noted no signs of depression, agitation, irritability, or anxiety, but he did note a history of depression.  AR 890–891.

Dr. Reynaldo Gotanco, who conducted the medical portion of the initial disability determination, noted that although Santos S. claimed he had a history of depression, no medical evidence supported a psychiatric diagnosis or treatment.  AR 87.  He further determined that because Santos S. was not statutorily blind but was insured for DIB for blindness only, his vision impairment was non-severe.  AR 88.  In formulating an RFC, Dr. Gotanco indicated that Santos S. could stand and/or walk for about six hours in an eight-hour workday and sit for the same amount of time.  AR 89.  He further assessed that Santos S. could not be expected to lift more

11

than twenty pounds because of the risk of retinal detachment occurring again. AR 89. He indicated that Santos S. could only occasionally climb ladders, ropes, and scaffolds, AR 89, and should avoid concentrated exposure to unprotected heights and hazardous machinery given his history of migraines, AR 90. He noted that Santos S. had limited left far acuity and would have difficulty distinguishing fine print. AR 90. On reconsideration, the examiner indicated that Santos S. provided insufficient additional evidence to support his disability claim and so did not provide an additional medical evaluation or revised RFC. AR 106–107.

Santos S. underwent another internal medicine consultative exam with Dr. Liana G. Palacci on August 30, 2023. AR 2692. Santos S. reported having Type II diabetes, blurry vision, polyuria, polydipsia, dry mouth, and neuropathy of the feet. AR 2692. He indicated a history of blindness in his left eye, having had four surgeries and with additional surgery recommended. AR 2692. Although he indicated he had "cloudy vision" and could "see light," he also stated he did not have difficulty with picking up coins, turning doorknobs, buttoning shirts, and tying shoelaces. AR 2692. Dr. Palacci noted in her examination that Santos S.' left pupil was irregular and did not react to light, and that without glasses on a Snellen exam, his right eye was 20/50, his left eye was blind, and in combination his vision was 20/50. AR 2693. Although Dr. Palacci indicated that Santos S. was obese, AR 2693, she opined that Santos S. could sit and stand, walk more than fifty feet unassisted, handle objects, lift and carry, and hear and speak without limitations. AR 2695.

Santos S. also had an ophthalmology consultative examination with Dr. Steven C. Eidt on September 22, 2023. AR 2698. Dr. Eidt recorded his Snellen visual acuity without correction as 20/70 in the right eye and only light perception in the left. AR 2698. He noted that manifest distance refraction of -1.00 +1.00 at 160 on the right eye led to 20/40 vision but no improvement

12

in the left. AR 2698. In field of vision testing, even after multiple attempts, Dr. Eidt noted that Santos S. had no discernible peripheral vision on his right side during testing but nonetheless did not have difficulty walking through hallways or in a dimly lit room. AR 2698. This suggested to Dr. Eidt that the peripheral vision testing was not consistent with Santos S.' actual peripheral vision. AR 2699. Dr. Eidt thought that Santos S.' vision in the left eye could potentially improve with additional surgeries to place a new lens. AR 2699.

### III. Hearing Testimony

At the February 1, 2024 hearing before the ALJ, Santos S. testified that he was fifty-five years old and did not have a permanent home, living instead in an abandoned semi-cab and containers. AR 43–44. He indicated that he used gas stations to wash up. AR 44. He stated he was about 5'2" and weighed approximately 190 pounds. AR 44–45. He did not have a valid driver's license. AR 45. Santos S. indicated he does not have a high school diploma, having attended high school for only a few months. AR 47. He also testified that he has no specific vocational training, having learned how to be a mechanic on the job. AR 47–48. He acknowledged having used drugs heavily in the 1980s and 1990s, but he claimed that his last use of cocaine had been in 2022. AR 48–49. Santos S. testified that he previously worked doing oil changes, AR 51–52, and that he currently survives by getting small amounts of money from people whose groceries he carries at Jewel and otherwise stealing food from grocery stores or gas stations, AR 51–53. Santos S. explained that he could not work because he could not see out of his left eye, which also made his vision blurry out of the right eye, and he had pain in his foot that caused him to lose balance. AR 53–54. He claimed that wearing glasses made his vision worse. AR 54. He claimed to have neuropathy in his right foot and hands. AR 54–55, 78. He complained of constant migraine headaches, for which he took aspirin. AR 55. He indicated

13

that about two to three hours after taking aspirin, his headaches went away. AR 56. He estimated that he could stand for approximately twenty to thirty minutes, sit for approximately forty minutes to an hour, and walk approximately half a block without taking a break. AR 57. He also thought he could sit in a chair for about four hours and lift a "case of pop." AR 59.

Santos S. testified that he has had pain in his lower stomach since having surgery in 2018, rating the pain approximately eight out of ten on a day-to-day basis. AR 65. He also testified to having chest pain since 2018, which makes it hard for him to breath and which he also rated as about seven or eight out of ten. AR 65–66. He claimed issues with excessive urination and a difficult time sleeping, indicating he slept approximately three hours a night but then also took several naps during the day of approximately an hour and a half to two hours in length. AR 67–68. He testified that he has tried to harm himself almost every day, has ugly thoughts, hears voices, and hallucinates. AR 70–71. He indicated that he experiences dizziness daily, which lasts hours at a time. AR 74. Santos S. estimated that he could focus on one thing for approximately twenty-five minutes but noted that he generally has difficulty concentrating. AR 79.

During the hearing, Santos S.' counsel acknowledged that he was not primarily asserting a severe impairment of a psychological nature, with the ALJ noting that Santos S. had not asserted such a thing before and so would need a medical review of such a claim before the ALJ could make a decision on it. AR 75–76. Counsel noted that he did not want to wait for another consultative examination on psychological issues before obtaining a decision from the ALJ. AR 76–77.

Nikita Nash, the vocational expert ("VE"), testified that assuming a hypothetical individual of Santos S.' age, education, and work experience, at all levels of exertion, with no

14

ladders, ropes, scaffolds, unprotected heights, or driving a motor vehicle, with visual acuity limited on the left, with work in front of the individual and not coming into his field of vision from the left, and with difficulty distinguishing fine print, the individual could perform Santos S.' past work as a lubrication servicer. AR 82. The VE also indicated that an individual with these restrictions could work as a coffee maker, a warehouse worker, and a meat clerk. At the light level of exertion, the VE indicated that an individual could perform the work of a lubrication servicer as Santos S. had previously performed it, though not as generally defined by the Dictionary of Occupational Titles, as well as perform the work of a bakery worker, parking lot attendant, and poultry boner. AR 82–83. With the same restrictions but also adding in the restriction that the individual would have difficulty distinguishing small objects at a distance, the VE indicated that an individual could perform the same jobs. AR 83. But, if the individual could not avoid common workplace hazards due to poor vision, then the VE indicated that the individual could not work in the national economy. AR 83–84.

## IV.  The ALJ's Decision

The ALJ found that Santos S. met the insured status requirement through December 31, 2023 and had not engaged in substantial gainful activity since January 1, 2018, his alleged onset date. AR 119. She assessed Santos S. to have a severe impairment based on low vision in the right eye and retinal detachment of the left eye due to trauma, which significantly limited his ability to perform basic work activities. AR 119. The ALJ also noted that Santos S.' medical records supported additional non-severe physical impairments of migraines and headaches, obesity, diabetes, gastroesophageal reflux disease ("GERD"), urinary incontinence, and peripheral neuropathy. AR 119–120. She noted that the "longitudinal treatment history . . . does not support more than a minimal effect on [Santos S.'] physical or mental ability to perform

15

basic work activities for a continuous period of 12 months, noting the often normal physical examination findings including normal respiratory exams, normal strength, indications of a nontender abdomen, normal range of motion, and repeated denials of related symptoms such as urinary frequency, numbness, and tingling, with reported activities that do not support finding these impairments as severe." AR 125. The ALJ nonetheless indicated that she accounted for Santos S.' severe and non-severe impairments in the RFC. She also found that his depression, anxiety, and substance abuse disorder did not pose more than a minimal limitation in his ability to perform basic mental work activities, making them non-severe. AR 125. The ALJ noted counsel's admission that he was not asserting severe mental impairments, focusing instead on physical issues, and the documented "normal mental and psychiatric findings documented in the longitudinal treatment history." AR 126. The ALJ did not find Santos S.' alleged deafness in one ear or reported hallucinations to be medically determinable impairments, given that the medical evidence did not reflect them and instead these purported impairments only appeared in Santos S.' own statement of his symptoms. AR 128.

At step three, the ALJ concluded that Santos S. did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR 128. She specifically considered listings in Section 2.00, noting the reasons why his impairments did not meet the listings for Section 2.02 (loss of visual acuity), 2.03 (contraction of the visual field in the better eye), or 2.04 (loss of efficiency). AR 129. The ALJ assessed Santos S. to have the RFC to perform light work, with the following restrictions: never climbing ladders, ropes, and scaffolds; never working at unprotected heights, with hazardous machinery, or driving a motor vehicle; work being in front of him and not coming into the field of vision from the left given that he only has vision in the

16

right eye; and difficulty distinguishing small objects at a distance. The ALJ found that Santos S.'
statements about the intensity, persistence, and effects of his symptoms were not entirely
consistent with the medical and other evidence in the record. AR 130. She noted that his
activities of daily living showed he had an ability to perform more significant activity than he
claimed on a regular basis, even if he could not sustain full-time work activity. AR 129–130.
The ALJ stated she fully considered the medical opinions and other administrative medical
findings but indicated that she did not give any specific evidentiary weight, including controlling
weight, or defer to any of them. AR 134.

Having determined Santos S.' RFC, and considering the VE's testimony, the ALJ
concluded that Santos S. could perform his past relevant work as a lubrication servicer. AR 135–
136. Based on this conclusion, the ALJ concluded that Santos S. was not disabled. AR 136.

## LEGAL STANDARD

### I.    Standard of Review

In reviewing the denial of disability benefits, the Court "will uphold the Commissioner's
final decision if the ALJ applied the correct legal standards and supported her decision with
substantial evidence." *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013). Substantial
evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a
conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consol. Edison Co. v. NLRB*,
305 U.S. 197, 229 (1938)). Although the Court reviews the entire record, it does not displace the
ALJ's judgment by reweighing facts or making independent credibility determinations.
*Beardsley v. Colvin*, 758 F.3d 834, 836–37 (7th Cir. 2014). But the Court may reverse and
remand the ALJ's decision if the ALJ committed an error of law or based her decision on serious
factual mistakes or omissions. *Id.* at 837. The Court also looks to "whether the ALJ built an

17

'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).  The ALJ "need not provide a complete written evaluation of every piece of testimony and evidence," *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012) (citation omitted), but "[i]f a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required," *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citation omitted).

## II.     Disability Standard

To qualify for DIB or SSI, a claimant must show that he is disabled, meaning that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Weatherbee v. Astrue*, 649 F.3d 565, 568 (7th Cir. 2011).  To determine whether a claimant is disabled, the SSA uses a five-step sequential analysis.  20 C.F.R. § 404.1520(a)(4); *Kastner*, 697 F.3d at 646.[1]  At step one, the ALJ determines whether the claimant has engaged in substantial gainful activity during the relevant period.  *See* 20 C.F.R. § 404.1520(a)(4)(i).  At step two, the ALJ considers whether the claimant's impairments are severe and meet the twelve-month durational requirement.  *Id.* §§ 404.1509, 404.1520(a)(4)(ii). At step three, the ALJ determines whether the claimant's impairment(s) meet or equal an impairment listed in the Social Security regulations.  *Id.* § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404, Subpt. P, App'x 1.  If the claimant's impairment(s) meet or equal a listing and meet the duration requirement, the claimant is disabled; if not, the analysis continues, and the ALJ assesses the

---

[1] Although the regulations contain separate sections for DIB and SSI, because "the processes of evaluation are identical in all respects relevant to this case," the Court only cites to the DIB regulations here.  *See Craft*, 539 F.3d at 647 n.6.

claimant's RFC. 20 C.F.R. § 404.1520(a)(4)(iii), (e). At step four, the ALJ considers the claimant's RFC and determines whether the claimant can perform past relevant work. *Id.* § 404.1520(a)(4)(iv). If the claimant can perform past relevant work, he is not disabled. *Id.* If he cannot, the ALJ proceeds to step five, where the ALJ determines whether a substantial number of jobs exist that the claimant can perform given his RFC, age, education, and work experience. *Id.* §§ 404.1520(a)(4)(v), 404.1560(c). If the claimant can perform other work, he is not disabled; if he cannot perform other work, he is disabled. *Id.* § 404.1520(a)(4)(v). The claimant bears the burden of proof at steps one through four, and the burden shifts to the government at step five. *Weatherbee*, 649 F.3d at 569.

## ANALYSIS

In seeking to overturn the ALJ's decision, Santos S. argues that the ALJ committed reversible error by improperly assessing the severity of his impairments and whether they met or equaled a listing, by relying on an RFC that was not supported by substantial evidence, and by incorrectly assessing his ability to perform his relevant past work. The Court addresses these arguments in turn.

## I. Alleged Step Two Error

First, Santos S. argues that the ALJ erred because she only found that his vision problems qualified as severe impairments and improperly treated the remainder of his recognized physical and mental impairments as non-severe. Specifically, the ALJ found that Santos S. had the following non-severe impairments: migraines and headaches, obesity, diabetes mellitus, GERD, urinary incontinence, peripheral neuropathy, depression, anxiety, and substance abuse disorder. AR 119–128. Santos S. argues that the ALJ ignored that his allegedly non-severe conditions are actually chronic and permanent and so she should have treated them as severe. But Santos S.

only makes a cursory argument to this effect, and the Court finds such a cursory argument insufficient to establish reversible error. This is particularly the case because, as the Seventh Circuit has stated, "[d]eciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even *one* severe impairment." *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) (citing *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010)). Because the ALJ here found at least one severe impairment, she continued to the next steps of the five-step process, considering both the severe and non-severe impairments to determine whether Santos S. could perform his past work. In other words, any potential failure to treat the remaining impairments as severe amounts to harmless error. *Id.*

## II. Alleged Step Three Error

Next, Santos S. argues that the ALJ erred because she only considered whether his visual impairments met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Santos S. acknowledges that to demonstrate error at step three, he must identify evidence that the ALJ ignored or misstated that establishes the requirements of a listing or equivalent severity. *Sims v. Barnhart*, 309 F.3d 424, 429–31 (7th Cir. 2002). But Santos S. does not identify any such evidence, only generally pointing to his documented history of blurred vision, poor visual acuity, severe anxiety, and depression, all of which he claims have persisted and worsened despite interventions and treatment. He does not identify any listings that he believes he met or how, however, and so he has not met his burden of showing a step three error. *See Hall v. Berryhill*, 906 F.3d 640, 645 (7th Cir. 2018) (claimant did not meet his burden to show that he met a listing where he argued in an undeveloped argument that the ALJ did not consider "unspecified" evidence that showed he met a listing).

### III.     Alleged RFC Error

A claimant's RFC represents the maximum he can do despite his limitations.  20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  An ALJ must base a claimant's RFC on all relevant evidence in the record, including the claimant's medical history and findings, the effects of treatment, reports of daily activities, and medical opinions.  20 C.F.R. § 404.1545(a)(3); SSR 96-8p, 1996 WL 374184, at *5.  When determining a claimant's RFC, an ALJ must consider all medically determinable impairments, including those that are not severe.  *Craft*, 539 F.3d at 676.  An ALJ must also consider all the effects and limitations resulting from those impairments.  *See Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014) ("When determining an individual's RFC, the ALJ must consider all limitations that arise from medically determinable impairments."); *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) ("An ALJ must consider the combined effects of all of the claimant's impairments; even those that would not be considered severe in isolation.").

The ALJ assessed Santos S. to have the RFC to perform light work, with the following restrictions: never climbing ladders, ropes, and scaffolds; never working at unprotected heights, with hazardous machinery, or driving a motor vehicle; work being in front of him and not coming into the field of vision from the left given that he only has vision in the right eye; and difficulty distinguishing small objects at a distance.  Santos S. argues that the ALJ did not ground her RFC determination in substantial evidence because the evidence indicates he can only perform sedentary work, while she found he could perform light work.  The regulations explain that light work may "require[ ] a good deal of walking or standing, or . . . involve[ ] sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b).  Sedentary work, on the other hand, "involves sitting," although "a certain amount of walking and

21

standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567(a). Santos S. highlights that he testified that he could only walk a half block at a time and had issues with balance, dizziness, and chronic pain, meaning he could not be expected to perform light work.

An ALJ must explain how she reaches her conclusion about the RFC of a claimant and support that conclusion with evidence from the record. *See, e.g.*, SSR 96-8p, 1996 WL 374184, at *7 ("The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence[.]"); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) ("The ALJ needed to explain how she reached her conclusions about Scott's physical capabilities[.]"); *Eakin v. Astrue*, 432 F. App'x 607, 611 (7th Cir. 2011) ("The RFC determinations should include a discussion describing how the evidence, both objective and subjective, supports the ultimate conclusion."). Here, the ALJ recounted the evidence in the record and explained the basis for her RFC assessment. She noted Santos S.' statements about his inability to walk far distances without stopping, as well as his testimony about imbalance, dizziness, and chronic pain, but she concluded that the evidence in the record did not entirely support this testimony and set forth the reasons for her disagreement. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability[.]"). Although Santos S. disagrees with the ALJ's decision, his mere disagreement as to the interpretation of the medical records and other evidence does not require remand, particularly where he does not point to any specific evidence the ALJ did not consider that contradicts her conclusions. *See Schmidt v. Barnhart*, 395 F.3d 737, 747 (7th Cir. 2005) (refusing to overturn ALJ's credibility assessment concerning the claimant's pain where the claimant only "rehash[ed]" medical records but did not "point to any specific evidence contradicting the ALJ's conclusions"). In such a situation, where reasonable minds could differ

as to a claimant's limitations, the Court must defer to the ALJ's decision. *See Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) ("We are not allowed to displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations. In fact, even if reasonable minds could differ concerning whether [the claimant] is disabled, we must nevertheless affirm the ALJ's decision denying her claims if the decision is adequately supported." (citations omitted) (internal quotation marks omitted)). Further, Santos S. cannot point to a doctor's opinion in the record that included greater limitations than those found by the ALJ, which undermines his contention that the ALJ committed reversible error. *See Dudley v. Berryhill*, 773 F. App'x 838, 843 (7th Cir. 2019) (finding no error in ALJ's RFC determination where no doctor's opinion imposed greater limitations on the claimant than those imposed by the ALJ). That Santos S. wishes the ALJ had given more credence to his testimony does not amount to reversible error, particularly where the ALJ explained her reasons for not crediting all his complaints, nor does it imply that the ALJ's RFC determination was without support in the record, where no medical opinions in the record call for greater limitations than those found by the ALJ.

## IV.    Ability to Perform Past Work

Santos S. relatedly challenges the ALJ's finding that he could perform his past work. Santos S. had the burden at step four to demonstrate that he could not perform his previous work.[2] *Young v. Sec'y of Health & Hum. Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). Santos S. merely disagrees about how the ALJ weighed the evidence, contending that she should have given more weight to his subjective complaints and the fact that he would require numerous breaks and absences if he found work, as well as that the ALJ should have followed the VE's

---

[2] To the extent Santos S. argues that the Commissioner bears the burden at step five, these arguments have no relevance because the ALJ reached her conclusion of no disability at step four, not step five.

conclusion that an individual who cannot avoid common workplace hazards cannot work at all. These arguments largely replicate Santos S.' arguments that the ALJ improperly determined his RFC. The Court has already determined that Santos S. has not shown error as to the RFC finding, and he has not provided any further basis to reconsider this decision. *See Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) ("When reviewing for substantial evidence, we do not displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations."). Santos S. had the opportunity to question the VE at the hearing, but his counsel did not provide any basis for rejecting or even questioning the VE's conclusions. Given this, the ALJ properly relied on the RFC finding and the testimony of the VE that Santos S. could perform his past work as a lubrication servicer. *See Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) ("When no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion[.]").

## CONCLUSION

For the foregoing reasons, the Court denies Santos S.' motion for summary judgment [18] and grants the Commissioner's motion for summary judgment [19]. The Court affirms the ALJ's decision and terminates this case.

Dated: March 11, 2026

SARA L. ELLIS
United States District Judge

24